# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　　　Plaintiff,<br><br>v.<br><br>**$43,900.00 IN UNITED STATES CURRENCY**.<br>　　　　Defendant. | Case No. _____ |

## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, Teresa A. Moore, United States Attorney for the Western District of Missouri, and Leigh Farmakidis, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### NATURE OF THE ACTION

1. This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881(a)(6).

### THE DEFENDANT *IN REM*

2. The defendant $43,900 in United States currency was seized from Bryant Lee Alvarez ("Alvarez") on May 19, 2022, at the Kansas City International (MCI) Airport, located at 34 N. Rome Circle, Kansas City, Missouri. It is presently in the custody of the United States Marshals Service in the Western District of Missouri.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. §

1355(a). This Court also has jurisdiction over this particular action under 21 U.S.C. § 881(a)(6).

4. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the defendant property is found in this district.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395, because the action accrued in this district and the defendant property is found in this district.

## BASIS FOR FORFEITURE

6. The defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; or 3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## FACTS

7. On May 19, 2022, members of the Drug Enforcement Administration (DEA) Kansas City Interdiction Task Force (KCITF) and agents with Homeland Security Investigations (HSI) conducted interdiction duties at the MCI Southwest Airlines terminal.

2

8. DEA Special Agents (SA) Jennifer Waller and Christopher Fattibene were working in the vicinity of Southwest Airlines boarding gate 39, while TFOs Sargis Zadoyan and Adriane Ferrer were located in the Southwest Airlines checked baggage room.

9. TFO Zadoyan, utilizing his drug odor detection canine, Leia, conducted a free air sniff of the checked bags for Southwest Airlines Flight 684 with service to Los Angeles, California.

10. Leia provided a positive alert to the odor of illegal narcotics on or about a small, black, soft-sided "Travelpro" brand suitcase ("small Travelpro suitcase") containing a Southwest Airlines bag tag displaying the name, "Alvarez/Bryant" ("Alvarez").

11. SA Waller made contact with Alvarez at the Southwest Airlines boarding terminal and introduced herself using her DEA credentials. SA Waller explained to Alvarez that a drug detecting canine had provided a positive alert to the odor of narcotics from his checked suitcase.

12. SA Waller asked Alvarez if he knew why the dog alerted to the odor of drugs from the small Travelpro suitcase. Alvarez stated he did not, and further advised that he had two checked suitcases.

13. SA Waller asked Alvarez if he had any illegal drugs, U.S. Currency ("USC"), or weapons in his checked suitcases, which Alvarez denied.

14. SA Waller asked Alvarez for consent to search his two checked suitcases, and Alvarez provided verbal consent.

15. TFO Ferrer searched Alvarez's small Travelpro suitcase and discovered two large, rubber-banded bundles of USC hidden within the zipped pockets of a pair of black shorts.

16. TFO Ferrer also located a one subject, college rule, blue notebook inside the small Travelpro suitcase. This notebook appears to be a drug ledger due to the written contents (*i.e.*, 1 White Runts @ 2000 and 1 White Runts @ 2100 for Ray; Mike Runtz @ 2000 for Stan).

17. Agents with KCITF have previously encountered "Runtz" in connection with their interdiction activities and know "Runtz" to refer to a specific strain of marijuana.

18. The USC and notebook were seized and recovered by DEA TFO Ferrer, as witnessed by TFO Zadoyan from the small Travelpro suitcase.

19. Alvarez agreed to continue speaking with the agents regarding the currency found in his small Travelpro suitcase. Alvarez produced a Missouri driver's license and confirmed the information on it was accurate, and also provided his telephone number.

20. Alvarez stated that he was the sole owner of the USC.

21. When asked, Alvarez first stated the amount of currency he was in possession of was "$30." SA Waller asked Alvarez if he meant $30,000, and Alvarez stated, "yes."

22. Alvarez then changed his statement claiming he had "$30,000, maybe $35,000," and then finally stated "$30 something."

23. SA Waller attempted to confirm with Alvarez that he had $30,000-$35,000 USC, and Alvarez said, "yes."

4

24. Alvarez told SA Waller that he counted the USC himself, but that he "went fast," so he was unsure of the exact amount.

25. SA Waller asked Alvarez what the source of the USC was, and Alvarez stated that he was a music artist, who also produced and was paid for doing features.

26. Alvarez further explained he had a YouTube channel with over 1.3 million subscribers, and he also had an Instagram account with 2 million followers.

27. Alvarez claimed he was paid to do features, and owned a business called "Beyond Rich," which was a music label.

28. Alvarez stated that his "Beyond Rich" business was formed in August 2021; Alvarez told SA Waller that he tried to form an LLC, but was unsuccessful.

29. Alvarez stated the USC was from his savings.

30. Alvarez told Agents he had no documentation or receipts for the USC despite having claimed his clients would pay him through PayPal, Applepay, and Cash App, in addition to cash.

31. SA Waller pointed out to Alvarez that if his clients paid him through the named applications, then he would have needed to withdraw the money to receive cash.

32. Alvarez explained that he would often receive the payment and then it would be transferred to another individual, or he would ask the client to pay him with "studio time."

33. Alvarez was unclear in his explanation of how he would ultimately withdraw the payment in cash.

5

34. Agents asked Alvarez whether he withdrew the USC from a bank, and at first, Alvarez said, "no," but then changed his story claiming that he withdrew some of it.

35. Alvarez stated that he packaged/grouped his USC by bill denomination, grouping the USC by $20 dollar bills, $50 dollar bills, etc.

36. SA Waller asked Alvarez if he was around any illegal drugs or if Alvarez was around anyone that used illegal drugs. Alvarez stated that he was not around drugs, but then quickly changed his statement claiming his best friend used marijuana, and that the artists he worked with were around drugs. Alvarez stated that the USC was not around drugs.

37. Alvarez stated he was flying out to Los Angeles, California to meet with a studio manager named "Daniella Prospero." Alvarez stated that Ms. Prospero was the studio manager for Paramount Studio.

38. Alvarez further explained that he brought the USC with him so that in the event he ran into music artists he wanted to work with, he would have the cash readily available to pay them.

39. Alvarez stated that he was not scheduled to meet with a specific client at the studio.

40. Alvarez stated that he intended to stay in Los Angeles for one week.

41. SA Waller asked Alvarez when he was flying back to Kansas City, and Alvarez stated "uh, it depends." Alvarez then told SA Waller that his brother passed away, which was the reason for his trip to Los Angeles.

6

42. Alvarez explained that he booked the flight last minute once he found out about his brother's passing, but when SA Waller questioned Alvarez about his brother's passing, Alvarez clarified that it is not his actual brother, but a close friend.

43. Alvarez stated that he was not sure when the funeral would be, so he was planning on staying in Los Angeles for a week in case the funeral was towards the end of the week.

44. SA Waller asked Alvarez if he booked a round-trip ticket from Kansas City to Los Angeles; at first Alvarez stated "yes," but then changed his answer, stating that he booked a one-way ticket.

45. Alvarez said he booked the one-way ticket from Kansas City to Los Angeles on the same day as the flight, May 19, 2022, and Alvarez stated he booked a one-way ticket from Los Angeles to Kansas City to fly back on the weekend.

46. Alvarez told SA Waller that he was staying in a hotel somewhere in the downtown Los Angeles area, but could not provide a hotel name, an exact address, or location. Alvarez stated that he could show past hotel reservations, but could not provide one for the current trip.

47. Alvarez stated that he purchased his ticket to Los Angeles the day before, May 18, 2022, and commented that he "messed up," and booked his flight last minute.

48. Alvarez told SA Waller that he had flown five times within the last year, and further stated that he was trying to move to Los Angeles.

49. SA Waller asked Alvarez where he had flown in the past, and Alvarez stated Atlanta, Georgia and Los Angeles, California, and stated that he flew on Southwest and Spirit airlines.

50. SA Waller asked Alvarez if he flew with other people, and Alvarez stated that he flew with his engineer named "Steve Vest" and his girlfriend "Kara Jean."

51. During this time, Alvarez's second checked suitcase, a large, black, "Travelpro" brand, soft-sided suitcase ("large Travelpro suitcase"), was located by TFOs Zadoyan and Ferrer. Canine Leia was once again deployed, and provided another positive alert to the odor of illegal drugs on or about Alvarez's large Travelpro suitcase.

52. TFO Ferrer subsequently searched Alvarez's large Travelpro suitcase and located a total of five large, rubber-banded bundles of an undetermined amount of USC. The bundles were separately hidden within the zipped pockets of a pair of black sweatpants, within the pocket of a pair of khaki pants, within the pant leg of a pair of blue and white sweatpants, and within a black sunglass case.

53. The USC was seized by TFO Ferrer, as witnessed by TFO Zadoyan.

54. Back at the boarding gate, Alvarez stated that "Beyond Rich" had been operating for one year.

55. SA Waller asked Alvarez whether he had any other source of income. Alvarez stated that he had recently gotten out of the Army, and had recently left his job at Echo Logistics, located in Overland Park, Kansas, where he had worked as a freight broker for approximately 1 year to 14 months.

56. Alvarez stated that his average income was $6,000-$8,000 per month, but said that he lived with his family, and his family owned the home. Alvarez claimed that he paid approximately $800-$1,000 per month in bills.

57. Alvarez stated that he had been saving the USC since August 2021, and claimed he had a few bank accounts, but provided no additional information. Alvarez further explained that he had not filed taxes on the USC.

58. Alvarez told SA Waller that he had flown with USC two to three times previously, and claimed that he was flying the USC for his own use.

59. SA Waller asked Alvarez if he knew anyone by the name of Adnan Klisturic ("Klisturic"), and Alvarez said he did not.

60. KCITF encountered Klisturic at MCI on October 7, 2021, at which time $79,650 was seized from him.

61. Agents had previously confirmed that Klisturic's telephone number had been in contact with Alvarez's telephone number during this money seizure from Klisturic on October 7, 2021.

62. Klisturic's telephone number had been in contact with Alvarez's telephone number 244 times from August 8, 2021, to October 7, 2021.

63. An analysis of the Verizon records provided for Alvarez's phone for the period of November 11, 2021, to January 10, 2022, indicate that Alvarez and Klisturic's work phone number were in contact 544 times.

64. SA Fattibene asked Alvarez why he did not keep his USC in the bank, to which Alvarez responded that his friends told him not to. SA Fattibene asked Alvarez

9

which of Alvarez's friends told him not to keep his money in the bank, and Alvarez stated the "dumb" ones.

65. Based on the information provided by Alvarez, including his inconsistent statements, the positive canine alerts, the lack of documentation provided for the origin of the USC, and the manner in which the USC was packaged (rubber-banded) and concealed (hidden within clothes, sunglass case, etc.), SA Waller advised Alvarez that the USC from both of his checked suitcases would be administratively seized by the DEA as they were believed to be illegal drug proceeds.

66. SA Waller further informed Alvarez that the DEA would also be seizing the notebook which appeared to be a drug ledger.

67. Alvarez began to get upset, stating that he had given the agents all the information regarding the USC and said that if the Agents needed receipts for him to keep the USC, then he would provide them, but again failed to show any documentation or receipts.

68. Alvarez again claimed that he did not have any drugs and that his friend smoked marijuana which was legal.

69. SA Waller advised Alvarez that it was not legal to smoke marijuana recreationally in Missouri nor was it legal federally. Alvarez responded by saying that his friend had a medical marijuana card.

70. SA Waller explained the process for Alvarez to file and re-claim the USC seized from both of his suitcases and confirmed Alvarez's address and phone number. Alvarez signed the DEA 12 Receipt for the USC and seized notebook.

10

Case 5:22-cv-06121-GAF   Document 1   Filed 11/07/22   Page 10 of 14

71. SA Waller provided Alvarez with a copy of the signed DEA 12 Receipt and advised Alvarez that he needed to board his flight to Los Angeles right away if he wished to continue his travel plans. Alvarez stated that he was not sure if he was going to continue with his flight without the USC. Alvarez then proceeded to speak with the Southwest Airlines Customer Service Agent regarding his ticket.

72. Throughout the duration of the consensual encounter with law enforcement, Agents asked Alvarez multiple times for documentation and/or receipts for the USC, which Alvarez could not produce.

73. Alvarez stated that he could provide receipts, but that he did not have them readily available. Alvarez also stated he could call some of his clients, but failed to actually call anyone to confirm his business transactions.

74. A subsequent inquiry with the Kansas Department of Labor revealed, since 2021, Alvarez had no reported wages in Kansas or any other states in the last 18 months.

75. Agents inquired with the Missouri Secretary of State but could not locate a company named "Beyond Rich."

76. Another inquiry with the Missouri Secretary of State website revealed Alvarez as a registered agent for a company called "B. Alvee LLC," registered to an address in Blue Springs, Missouri, which was formed on May 16, 2022, and is currently active.

77. The total USC seized from Alvarez's small Travelpro suitcase was $10,000.00. The total USC seized from Alvarez's large Travelpro suitcase was $33,900.00.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

78. The Plaintiff repeats and incorporates by reference the paragraphs above.

79. By the foregoing and other acts, defendant $43,900 in United States currency constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in in violation of 21 U.S.C. § 801, *et seq*., and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

80. The Plaintiff repeats and incorporates by reference the paragraphs above.

81. By the foregoing and other acts, defendant $43,900 in United States currency constitutes proceeds traceable to an exchange of moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq*., and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

## THIRD CLAIM FOR RELIEF

82. The Plaintiff repeats and incorporates by reference the paragraphs above.

83. By the foregoing and other acts, defendant $43,900 in United States currency constitutes moneys, negotiable instruments, securities, or other things of value used or intended to be used to facilitate any violation of 21 U.S.C. § 801, *et seq*., and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE the United States prays that the defendant $43,900 in United States Currency be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Teresa A. Moore
United States Attorney

By

*/s/ Leigh Farmakidis*
Leigh Farmakidis
Assistant United States Attorney
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122
Leigh.Farmakidis@usdoj.gov

# VERIFICATION

I, Task Force Officer Sargis Zadoyan, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the United States Drug Enforcement Administration, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs seven through 77 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer with the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/7/22

SARGIS ZADOYAN (Affiliate)
Digitally signed by SARGIS ZADOYAN (Affiliate)
Date: 2022.11.07 15:07:18 -06'00'

Sargis Zadoyan
Task Force Officer
Drug Enforcement Administration